FRANCIS M. GREGOREK (144785)
BETSY C. MANIFOLD (182450)
FRANCIS A. BOTTINI, JR. (175783)
RACHELE R. RICKERT (190634)
WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP
Symphony Tower
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

[Additional Counsel Appear On Signature Page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

WOLLASTON G. MORIN, IN THE RIGHT OF AND FOR THE BENEFIT OF SANMINA-SCI CORPORATION,

    Plaintiff,

v.

JURE SOLA, RANDY FURR, MICHAEL LANDY, ELIZABETH JORDAN, RICK R. ACKEL, BERNARD WITNEY, HARI PILLAI, STEVE BRUTON, NEIL BONKE, ALAIN COUDER, MARIO ROSATI, A. EUGENE SAPP, JR., WAYNE SHORTRIDGE, PETER SIMONE, JACKIE WARD,

    Defendants,

and

SANMINA-SCI CORPORATION,

    Nominal Defendant.

Case No. C 06 4260 RMW HRL

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

JURY TRIAL DEMANDED

Plaintiff, Wollaston G. Morin, by and through his attorneys, derivatively on behalf of Sanmina-SCI Corporation ("Sanmina" or the "Company"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding the Company as follows:

## SUMMARY

1. Plaintiff, derivatively on behalf of nominal defendant Sanmina, seeks relief for the damages sustained, and to be sustained by the Company, against its Chairman and Chief Executive Officer ("CEO"), certain past and present officers and members of its Board of Directors for violations of state and federal law, including their breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), which occurred between October 1, 1996 and the present (the "Relevant Period").

2. Defendant Jure Sola, the Company's Chairman of the Board and CEO, and certain past and present officers, have engaged in certain transactions, including the exercise of back-dated options, to reap millions of dollars in unlawful windfall profits at the expense of the Company.

3. A stock option granted to an employee of the Company allows the employee to purchase Company stock at a specified price — referred to as the "exercise price" — for a specified period of time. Stock options are granted as part of employees' compensation packages to create incentives for them to boost profitability and stock value. When an employee exercises an option, he or she purchases the stock from the Company at the exercise price, regardless of the stock's price at the time the option is exercised.

4. The unlawful conduct occurred while defendants were directing the Company. These defendants authorized or failed to halt the back-dating of options in dereliction of their fiduciary duties to the Company as officers and directors, thus causing or allowing the Company to suffer millions of dollars in harm.

5. Pursuant to the Company's stock option plan, options are required to be priced at the price of the Company stock on the day of the grant. If an option is back-dated to a day on which a market price was lower than the price on the day the option is granted, then the employee pays less and the company gets less money for the stock when the option is exercised. Furthermore, the purchaser of the option gets a greater compensation than that to which he or she is entitled. In a June 10, 2006 *Wall Street Journal* article titled "Silicon Valley Firms Draw SEC Options Inquiries," the author called this practice "roughly akin to being allowed to bet on a horse race after it is over."

6. From October 1, 1996, to September 30, 2002, defendants authorized, modified, or failed to halt the back-dating of stock option grants to certain officers of the Company.

7. As a result these officers were unjustly enriched to the detriment of the Company and its shareholders. Back-dating the options also breached defendants' fiduciary duties of care, loyalty, and good faith to the Company.

## I. PARTIES

### The Plaintiff

8. Plaintiff Wollaston G. Morin is a resident of Massachusetts and has owned at all times relevant to this action, and continues to own, the Company's common stock.

9. As a current holder of Sanmina common stock and a holder during the period of the wrongs alleged herein, and pursuant to Fed. R. Civ. P. 23.1, plaintiff has standing to assert these claims on behalf of the Company and will fairly and adequately protect the interests of the Company and its other stockholders.

### The Nominal Defendant

10. Nominal Defendant Sanmina is a corporation duly organized and existing under the laws of the State of Delaware, with its principal executive offices and principal place of business at 2700 North First Street, San Jose, California 95134. The Company is the result of a merger between Sanmina Corporation and SCI Systems Inc. ("SCI"). The merger, which took place in 2001, made the Company one of the leading electronics contracts manufacturers in the world.

11. Sanmina provides customized, integrated electronics manufacturing services

worldwide. The Company's portfolio of services includes: product design and engineering, including initial development, design, preproduction services, and manufacturing design; volume manufacturing of systems, components, and subassemblies; final system assembly and test; direct order fulfillment and logistics services; and after-market product service and support. The Company manufactures printed circuit boards, printed circuit board assemblies, backplanes and backplane assemblies, enclosures, cable assemblies, precision machine components, optical modules, and memory modules. Sanmina offers its services primarily to original equipment manufacturers in the communications, computing and storage, multimedia, industrial and semiconductor capital equipment, defense and aerospace, medical, and automotive industries.

**The Director Defendants**

12. The following parties, sometimes referred to herein as the "Director Defendants," served as members of the Board of Directors of the Company as follows:

13. Defendant Neil Bonke ("Bonke") has served as a director of the Company since 1995. Mr. Bonke has been on the Audit Committee and the Compensation Committee since 1996. He has been Chair of the Compensation Committee since 2001. Additionally, Mr. Bonke was on the Officer Stock Committee from 1996 through 2002. Mr. Bonke is a California resident.

14. Defendant Alain Couder ("Couder") has been a director since 2005. Mr. Couder is currently President and CEO of privately owned Solid Information Technology. Mr. Couder was a venture advisor for Sofinnova Ventures, a venture capital firm and president and CEO of Confluent Software, Inc. a software development company from 2003 to 2004 when it was acquired by Oblix. From 2002 to 2003, Mr. Couder served as President and CEO of privately held IP Dynamics, Inc., a provider of carrier-class security software; from 2000 through 2002, Mr. Couder was COO of Agilent Technologies; and from 1998 to 1999 Mr. Couder served as Chairman, President, and CEO of Packard Bell NEC, Inc. Mr. Couder is a California resident.

15. Defendant Mario Rosati ("Rosati") has been a director of the Company since 1997. He has been a member of the law firm Wilson Sonsini Goodrich & Rosati, Professional Corporation since 1971. Mr. Rosati is a director of Aehr Test Systems, a manufacturer of computer hardware testing systems, Genus, Inc., a semiconductor equipment manufacturer,

Symyx Technologies, Inc., a combinatorial materials science company, and Vivus, Inc., a specialty pharmaceutical company, all publicly-held companies. Mr. Rosati is a resident of California.

16. Defendant A. Eugene Sapp, Jr. ("Sapp") served as co-chairman of the Sanmina Board of Directors from December 2001 to December 2002 and continues to serve as a director of Sanmina. In 1962, Mr. Sapp joined SCI and after holding several positions, was promoted to president and Chief Operating Officer in 1981. In July 1999, Mr. Sapp was appointed CEO of SCI and served as Chairman of the Board and CEO from July 2000 until the Company's merger with SCI. Mr. Sapp currently serves as a director of Artesyn Technologies. Mr. Sapp is a resident of California.

17. Defendant Wayne Shortridge ("Shortridge") has served as a director since December 2001. Mr. Shortridge serves on the Compensation Committee and on the Nominating and Governance Committee. From 1992 until the merger with SCI, he served as director of SCI. Mr. Shortridge is an attorney. From 1994 to 2004 he was a partner in the law firm of Paul, Hastings, Janofsky & Walker LLP in Atlanta, Georgia. Mr. Shortridge is currently a shareholder of the law firm of Carlton Fields, PA, and practices in that firm's Atlanta office. Mr. Shortridge is a resident of Atlanta, Georgia.

18. Defendant Peter Simone ("Simone") has served as a director of the Company since December 2003. Mr. Simone is Chair of the Audit Committee. Mr. Simone currently serves as a director of Cymer, Inc., Veeco Instruments, Inc., Newport Corporation and several private companies. Mr. Simone is also an independent consultant to several private companies and the investment community. Mr. Simone was Executive Chairman of SpeedFam-IPEC, Inc., a semiconductor equipment company, from June 2001 to December 2002, when it was acquired by Novellus Systems, Inc. He was a director of Active Controls eXperts, Inc., a leading supplier of precision motion control and smart structures technology, while also serving as a consultant, then President from January 2000 to February 2001 when it was acquired by Cymer, Inc. He served as President, CEO and director of Xionics Document Technologies, Inc., a provider of embedded software solutions for printer and copier OEMs, from April 1997 until Xionics' merger with Oak

Technology, Inc. in January 2000. Mr. Simone is a certified public accountant. He is a resident of California.

19. Defendant Jackie Ward ("Ward") has served as a director of the Company since December 2001. From 1992 until the merger with SCI, she served as a director of SCI. Ms. Ward has served on the Company's Compensation Committee since 2003. Ms. Ward also serves as a director of Wellpoint, Inc., Bank of America Corporation, Equifax, Inc., a credit information service, Flowers Foods, Inc., a baking company, and SYSCO Corporation, a food service distributor, all publicly held companies. Since December 2000, Ms. Ward has been the Outside Managing Director of Intec Telecom Systems, USA, a provider of turnkey telecommunication systems and products. From 1968 to 2000, she was a founder and served as President, Chief Executive Officer and Chairman of Computer Generation Incorporated. Ms. Ward is a resident of California.

20. Defendants Bonke, Couder, Rosati, Sapp, Shortridge, Simone, and Ward are sometimes collective referred to as the "Director Defendants."

**The Officer Defendants**

21. Defendant Jure Sola ("Sola") is Chairman of the Board and CEO of the Company. Mr. Sola has served as CEO since April 1991, as Chairman of the Board of Directors from April 1991 to December 2001 and from December 2002 to present, and Co-chairman of the Board of Directors from December 2001 to December 2002. In 1980, Mr. Sola co-founded Sanmina and initially held the position of Vice President of Sales. In October 1987, he became Vice President and General Manager of Sanmina, responsible for manufacturing operations, sales and marketing. In July 1989, Mr. Sola was elected as a director and in October 1989 was appointed as President of Sanmina. In March 1996, Mr. Sola relinquished the title of President when Mr. Furr was appointed to the position. Mr. Sola was on the Compensation Committee from 1996 through 2002; he was Chair of that Committee until 2001. Mr. Sola is a resident of Saratoga, California.

22. Defendant Rick R. Ackel ("Ackel") was Executive Vice President, Finance and Chief Financial Officer of the Company from June 29, 2000, to February 2004. Mr. Ackel is a resident of California.

23. Defendant Steve Bruton ("Bruton") is President and General Manager, Sanmina-SCI PCB Fabrication. Mr. Bruton has been with the Company since 2001. He is a resident of California.

24. Defendant Randy Furr ("Furr") is the President and Chief Operating Officer of the Company. Mr. Furr was hired as Vice President and Chief Financial Officer of Sanmina Corporation in August 1992. In March 1996, Mr. Furr was appointed President and Chief Operating Officer. In December 1999, Mr. Furr was appointed to the Board of Directors of the Company. Mr. Furr is a Certified Public Accountant. He is a California resident.

25. Defendant Elizabeth Jordan ("Jordan") joined Sanmina in October 1997 as Corporate Controller. Ms. Jordan was named Vice President of Finance in October 1998. She became Executive Vice President and Chief Financial Officer in June 1999 and remained at that post until her resignation in June 2000. She is a California resident.

26. Defendant Michael Landy ("Landy") held various positions within the Company during the Relevant Period. Mr. Landy was promoted to President of European Operations in March 2000, prior to that he had been employed by the Company as Vice President, Sales and Marketing, and Executive Vice President, Sales and Marketing. Mr. Landy is a California resident.

27. Defendant Hari Pillai ("Pillai") is President Global Operations of the Company. He has been with the Company since 2001. Mr. Pillai is a California resident.

28. Defendant Bernard Whitney ("Whitney") was with the Company from 1997 to 1999. Mr. Whitney joined the Company as Vice President and Chief Financial Officer in August 1997. He became Executive Vice President and Chief Financial Officer in October 1998 and remained there until his resignation in June 1999. Mr. Whitney is an Illinois resident.

29. Defendants Sola, Pillai, Bruton, Ackel, Furr, Jordan, Landy and Whitney are sometimes hereinafter referred to as the "Officer Defendants."

30. The Director Defendants and Officer Defendants are sometimes collectively referred to herein as the "D&O Defendants."

## II. JURISDICTION AND VENUE

31. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331, because plaintiff's claims arise in part under the Constitution and the laws of the United States. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). Additionally, this Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

32. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(a)(1) because one or more of defendants either resides or maintains executives offices in this Judicial District, and a substantial portion the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District. Moreover, defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## III. FACTS

33. Sanmina Corporation was co-founded in 1980 by Mr. Sola. In 2001, Sanmina Corporation merged with SCI. As a result of the merger, the surviving entity was named Sanmina-SCI Corporation. The boards of both companies merged and shares of SCI were converted into shares of Sanmina Corporation.

34. From 1996 to 2001 Sanmina Corporation had in place the "Amended 1990 Stock Incentive Plan." The plan covered options granted to employees, consultants and outside directors of the respective company. Under the plan the exercise price of option grants was to be no less than the fair market value on the day of the grant.

35. The Compensation Committee was responsible for reviewing and making recommendations to the Board concerning salaries and incentive compensation for executive officers and certain employees of the Company. Similarly, the Officer Stock Committee was charged with reviewing and making recommendations to the Board concerning option grants to

the executive officers of the Company. Both committees were directly responsible for overseeing option grants and reporting back to the entire Board for approval.

36. On May 19, 2006, *The Wall Street Journal* published an analysis of stock options granted to chief executive officers of half a dozen companies in an article titled, "U.S. INTENSIFIES STOCK-OPTIONS PROBE: Subpoenas by Prosecutors in Manhattan Office Signal Major Step-up in Scrutiny." The subject matter of this article, and several others in previous and subsequent days, was the illegal backdating of stock option grants to senior executives at the expense of public companies like Sanmina and its shareholders.

37. In a press release dated June 9, 2006, the Company reported that the staff of the Securities and Exchange Commission ("SEC") had contacted Sanmina and requested information regarding option grants to its executive officers, directors, and employees for the period since January 1, 1997.

38. The Company's fiscal year runs from October 1 to September 30. From the period of October 1, 1996 to September 30, 2002 (i.e. fiscal years 1997 – 2002) the company granted the following options:

   a.  On October 23, 1996, the Company granted options to defendants Sola, Whitney, and Landy at an exercise price of $40.13 per share. On October 22, 1996 the price of the Company's stock was $41.00 per share, while the day after the option grant, on October 24, 1996, the price of the stock was $42.50 per share. Within a week after the option grants, by October 28, 1996, the stock had climbed to a price of $46.75 per share.[1]

   b.  On April 2, 1997, the Company granted options to defendant Furr, at an exercise price of $43.75 per share. On April 1, 1997, the day before, the stock price was $44.56 per share, while on April 3, 1997, the stock price was $47.06 per share. Just two days after the options had been granted, on April 4, 1997, the stock had appreciated over 14% to close at $51.00 per share.

   c.  On August 15, 1997, the Company granted options to defendant Whitney at an exercise price of $72.75 per share. On August 14, 1997, the price of the Company's stock was $75.00 per share. On August 18, 1997, the next business day after the alleged option grant, the Company's stock price was $73.62 per share. Less than two weeks after the alleged grant date, by August 28, 1997, the

---

[1] All prices have been adjusted for stock splits

stock was trading at $80.00 per share.

    d.    On October 27, 1997, the Company granted options to defendants Sola, Furr and Landy at an exercise price of $32.32 per share. This was an especially lucrative option grant for the defendants considering that on October 24, 1997, just one business day before the grant, the price of the Company's stock was $37.20 per share, while the day after the option grant, on October 28, 1997, the price of the stock was $39.36 per share.

    e.    On October 5, 1998, the Company granted options to defendants Sola, Furr, Jordan, and Landy at an exercise price of $23.88 per share. On October 2, 1998, just one business day before the alleged grant, the price of the Company's stock was $26.25 per share, while the day after the option grant, on October 6, 1998, the price of the stock was $24.56 per share. Within a week after the option grants, by October 12, 1998, the stock had climbed to a price of $28.00 per share.

    f.    On June 11, 1999, the Company granted options to defendant Jordan at an exercise price of $73.63 per share.[2] On June 10, 1999, the price of the Company's stock was $73.75 per share, while one business day after the alleged grant, on June 14, 1999, the price of the stock was $74.13 per share. Ten days later by June 21, 1999, the stock had climbed to $81.22 per share.

    g.    On October 18, 1999, the Company granted options to defendants Sola, Furr, Landy, and Jordan. The price of the Company's stock that day was $18.985 per share. On October 15, 1999, the business day before the alleged grant, the price of the Company's stock was $19.99 per share, while the day after the option grant, on October 19, 1999, the price of the Company's stock was $19.05 per share. Less than one month later, by November 11, 1999 the price of the Company's stock was $26.97 per share.

    h.    On December 19, 2000, the Company granted options to defendants Sola, Furr, and Ackel. The price of the Company's stock that day was $33.00 per share. On December 18, 2000 the price of the Company's stock was $36.06 per share. Less than ten days after the alleged grant date, by December 28, 2000 the Company's stock price had climbed to $39.59 per share.

    i.    On October 1, 2001, the Company granted options to defendants Sola, Furr, Ackel, Pillai, and Bruton at an exercise price of $13.28 per share. On September 28, 2001, just one business day before the alleged grant date, the price of the Company's stock was $13.58 per share, while the day after the option grant, on October 2, 2001, the

---

[2] Defendant Ackel, also allegedly received an option grant on this date, although his shares were granted at $60.00 per share. Moreover, Ackel's option grant did not appear in the Company's 1999 proxy, which is where it should have been reported, instead it was reported in the Company's 2000 proxy. This is further evidence of backdating.

price of the stock was $13.37 per share. Within ten days after the option grants, by October 11, 2001, the stock had climbed to a price of $17.20 per share.

39. The aforementioned option grants were all awarded on lows in the Company's stock price that came right before a run up in the Company's stock price. The odds against this happening coincidentally are enormous.

## IV. OBLIGATIONS AND DUTIES OF THE DEFENDANTS

40. By reason of their positions as directors, officers, and/or fiduciaries of the Company and because of their ability to control the business, corporate and financial affairs of the Company, each of the D&O Defendants owed the Company and its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets; the duty of loyalty, to put the interests of the Company above their own financial interests; and the duty of candor, including full and candid disclosure of all material facts related thereto. Further, the D&O Defendants owed a duty to the Company and its shareholders to ensure that the Company operated in compliance with all applicable federal and state laws, rules, and regulations, and that the Company not engage in any unsafe, unsound, or illegal business practices. The conduct of the D&O Defendants complained of herein involves knowing violations of their duties as officers and directors of the Company, and the absence of good faith on their part, which the D&O Defendants were aware or should have been aware, posed a risk of serious injury to the Company.

41. To discharge these duties, D&O Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company. By virtue of this obligation of ordinary care and diligence, the D&O Defendants were required, among other things, to:

(a) manage, conduct, supervise, and direct the employees, businesses and affairs of the Company in accordance with laws, rules and regulations, and the charter and by-laws of the Company;

(b) neither violate nor knowingly or recklessly permit any officer, director or employee of the Company to violate applicable laws, rules and regulations, and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by the Company;

(c) remain informed as to how the Company was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report information internally, to allow defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

(d) supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by the Company, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company, and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

(e) preserve and enhance the Company's reputation as befits a public corporation and to maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

42. Defendants breached their duties of loyalty, full disclosure, due care and/or good faith by back-dating options and/or allowing the D&O Defendants to cause, or by themselves causing, the Company to misrepresent its financial results, as detailed herein, and/or by failing to prevent the D&O Defendants from taking such illegal actions.

**The Consequences**

43. As a result of the back-dating and other manipulation of options issued to the Officer Defendants, they have been unjustly enriched in the amount of millions of dollars at the expense of the Company. The Company has received and will receive less money from the Officer Defendants when they exercise their options at prices substantially lower than they would have if the options had not been back-dated.

44. The practice of back-dating stock options not only lined the pockets of the Company's executives at the direct expense of the Company, but also resulted in the overstatement of the Company's profits. This is because options priced below the stock's fair market value when they were awarded brought the recipient an instant paper gain that must be accounted for as additional compensation and treated as an expense to the Company. The Company must account for the options at a lower price, and may have to restate its results to

1 | reflect the previously unreported expenses.

2 |     45. The practice of back-dating options has caused the Company to suffer additional adverse consequences, including (i) the drop in its stock price attributable to the market's loss of confidence in the Company's management, thus increasing the Company's cost of borrowing and otherwise harming its operations, and (ii) exposure to the cost of defending against and potential liability for regulatory actions and private securities class actions.

## V. THE SANMINA BOARD

46. During the Relevant Period, the Company, through the actions of its Board of Directors and its Compensation Committee, granted stock options for the purchase of millions of shares of the Company's common stock to the Officer Defendants.

47. Director Defendants misrepresented and actively concealed and caused the Company to misrepresent and actively conceal in public SEC filings that the stock options were priced at no less than the fair market value of the stock on the date of the grant, thereby affirmatively concealing the claims set forth herein. The stock option plan, referenced above, was an exhibit that was incorporated by reference each year in the Company's Annual Reports on Form 10-K. Also, the Officer Defendants' compensation, including their stock option grants, were disclosed in the Company's yearly proxy statements promulgated in connection with the Company's annual meetings. The Director Defendants' misrepresentations about their stock option pricing practices were known to be false or were made in reckless disregard of its truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder, prior to commencement of the SEC investigation.

48. Contrary to the provisions in the Company's option plan and public disclosures, as shown by the pattern of grant dates that were highly favorable to the Officer Defendants, the stock options were not, in fact, priced on the date of the grant, but were, in fact, back-dated illegally and/or designed solely to benefit the Officer Defendants.

49. Director Defendants stood in a fiduciary relationship with the Company's shareholders and thereby owed them duties of due care and loyalty. These duties require the Board to act in good faith, with the care an ordinarily prudent person in a like position would exercise

under similar circumstances, and in a manner he or she reasonably believes to be in the best interest of the Company and its shareholders.

50.  Director Defendants violated their fiduciary duties to the Company by failing to act with due care, loyalty and good faith when they either expressly authorized the practice of back-dating options, or in conscious abrogation of their fiduciary duties, permitted it to occur.

51.  Instead of properly disclosing these improper stock option backdating practices and the corresponding understatement of compensation costs, Director Defendants caused or allowed these practices to continue unabated throughout the Relevant Period.

52.  Director Defendants' breaches of their fiduciary duties have exposed the Company to a number of harms including: the expense of internal investigation; the expense of SEC investigations; the potential liability under tax laws and federal securities laws; the possibility of having to restate financial results; and liability to stock purchasers.

## VI.  DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

53.  Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, by the Company as a direct result of the breach of fiduciary duty, waste of corporate assets, and unjust enrichment, alleged herein. The Company is named as a nominal defendant solely in a derivative capacity.

54.  Plaintiff will adequately and fairly represent the interest of the Company in enforcing and prosecuting its rights.

55.  Plaintiff is and has continuously been an owner of the Company stock during the wrongful conduct alleged herein.

56.  Plaintiff did not make demand on the Board of Directors of the Company to bring this action on behalf of the Company because such a demand would have been a futile, wasteful and useless act for the following reasons:

(a)  Between 1996 and 2002, defendant Sola was the recipient of the stock options which plaintiff alleges were back-dated. Because Sola received a personal financial benefit from the challenged transactions, he is interested and demand upon him is futile.

(b)  All of the Director Defendants authorized, approved, ratified or have failed

to rectify some or all of the back-dated stock option grants at issue here and are named as defendants herein.

(c) The Board of Directors was, at all relevant times, responsible for overseeing the Company's stock option plan. The administrator of the plan was required to report back to the entire Board on all aspects of compensation prior to approving any one stock option grant. The administrator of the plan, and the Board, by its approval of the administrator's recommendations, enabled, or, through conscious abdication of duty, permitted the Company to back-date stock options issued to the Officer Defendants. By such actions, defendants breached their fiduciary duties to the Company. The back-dating of stock options was in direct violation of the Company's stock option plan.

(d) The back-dating of options as alleged herein was unlawful and not within defendants' business judgment to acquire, authorize, ratify or facilitate.

(e) There was no basis or justification for back-dating the stock options. It was designed solely to benefit the Officer Defendants in a manner that was inconsistent with the Company's stock option plans, and the Company's public disclosures, to the detriment of the Company. Hence, the transactions constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by the defendants.

(f) All of the Director Defendants authorized the filing of Proxy Statements, in support of their nomination as directors, which failed to disclose that the Officer Directors' stock options had been back-dated. They also authorized the disclosure of a shareholder approved stock option plan and misrepresented that the options awarded under the stock option plan carry the stock price of the day of the award. Any suit by the defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

(g) Certain of the defendants signed the Company's Annual Reports on SEC Form 10-K between 1997 and 2002, which contained the Company's financial statements, which failed to account for the back-dated stock options as compensation and an expense of the

Company. As a result, those financial statements of the Company may have overstated its profits and may need to be restated. Any suit by the defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

(h)     All of the defendants participated in, approved, or through abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company stockholders and/or acting with negligence and gross negligence disregarded the wrongs complained of herein, and therefore are not disinterested parties.

(i)     On information and belief, defendants are protected against liability for breaches of fiduciary duty alleged in the Complaint by directors' and officers' liability insurance policies. However, under those policies, if defendants were to cause the Company to sue itself or certain officers of Sanmina, there would be no directors' and officers' insurance protection. This is yet another reason why defendants are hopelessly conflicted in making any independent determination that would cause the Company to bring this action.

(j)     Despite the D&O Defendants' breaches of duty, the Board of Directors has not recommended that any Defendant be relieved of his or her duties as an officer or director. By maintaining the *status quo* in light of these breaches of duty, the entire Board failed to exercise proper business judgment and therefore lacks independence.

(k)     Most egregiously, the Board of Directors did not require that Officer Defendants immediately disgorge all of their ill-gotten gains from their improper manipulation of their stock option grants, did not require them to return all unexecuted stock options to the Company, and did not require them to disgorge their bonuses and equity-based compensation to the Company, despite their indisputable breaches of fiduciary duties, which worked a direct harm to the Company. Nor did they take any other action, including commencing legal proceedings, to protect the interests of the Company.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act

57. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

58. Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to shareholders which were contained in the Company's Definitive Proxies filed on December 18, 2002, and December 19, 2003, which, in their disclosures concerning executive compensation, misrepresented or failed to disclose, *inter alia,* the facts set forth above. By reasons of the conduct alleged herein, each Director Defendant violated Section 14(a) of the Exchange Act. The information would have been material to the Company's shareholders in determining whether to elect directors to manage their company.

59. Plaintiff, on behalf of the Company, thereby seeks to void the election of Director Defendants based upon the misleading and incomplete proxy materials, and to recover damages caused by defendants' failure to disclose the improper compensation described herein.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

60. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

61. The defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

62. The defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

63. Each of the defendants authorized, or by abdication of duty, permitted the stock options granted to the Officer Defendants to be back-dated. These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

64. As a direct and proximate result of the defendants' breaches of their fiduciary duties, defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to the Company's reputation, business and good

will.

65. The Company has been directly and substantially injured by reason of the defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT III

### Against All Defendants for Gross Mismanagement

66. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

67. By their actions alleged herein, the defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

68. As a direct and proximate result of the defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages in the millions of dollars.

69. As a result of the misconduct and breaches of duty alleged herein, the defendants are liable to the Company.

## COUNT IV

### Against Defendants for Waste of Corporate Assets

70. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

71. By engaging in the wrongdoing alleged herein, defendants wasted corporate assets by, among other things, improperly granting stock option grants, improperly manipulating stock options, failing to recover improperly secured profits, damaging the goodwill and reputation of the Company, and exposing the company to civil and criminal liability, for which they are liable.

72. As a direct and proximate result of defendants' wrongful conduct, the Company has suffered damages in an amount to be proven at trial.

## COUNT V

### Against the Officer Defendants for Unjust Enrichment and Breach of the Duty of Loyalty

73. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

74. As a result of the back-dating of the options granted to them, the Officer Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the Company.

75. Accordingly, this Court should order the Officer Defendants to disgorge all profits, benefits and other compensation obtained by the Officer Defendants, and each of them, from their wrongful conduct and fiduciary breaches described herein, and should order the options held by the Officer Defendants, which have not yet been exercised, to be repriced at the market price of the Company's stock on the dates the Court finds that those options were actually, in fact, granted.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, gross mismanagement, waste of corporate assets and unjust enrichment;

B. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including declaring the improper compensation awards complained of herein to be null and void; and attaching, impounding and/or imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of the Company have an effective remedy;

C. Awarding to the Company restitution from the Officer Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Officer Defendants as a result of the conduct alleged herein;

D. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: July 11, 2006

WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ, LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
FRANCIS A. BOTTINI, JR.
RACHELE R. RICKERT

*/s/ Betsy C. Manifold*
BETSY C. MANIFOLD

750 B. Street, Suite 2770
San Diego, California 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

THE LAW OFFICE OF PETER A. LAGORIO
Peter A. Lagorio
The Prince Building
43 Atlantic Avenue
Boston, MA 02110
Telephone: 617/367-4200
Facsimile: 617/227-3384

Attorneys for Plaintiff Wollaston G. Morin

SANMINA. 13500.CPT